UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

DIANA CECIL                                                                                              PLAINTIFF

v.                                                                        CIVIL ACTION NO. 3:03CV-540-S

LOUISVILLE WATER COMPANY                                                                 DEFENDANT

### MEMORANDUM OPINION

This matter is before the court on motion of the defendant, Louisville Water Company ("LWC"), for summary judgment (DN 69) in this action alleging gender discrimination, hostile work environment, and retaliation. The plaintiff, Diana Cecil, has filed a motion for leave to file additional evidence in opposition to summary judgment (DN 92) which will be granted.[1]

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent

---

[1]The court also has before it a companion case styled *Debra Vaughn v. Louisville Water Company*, 3:03-CV-541-S which has similar pending motions. The plaintiffs were both complainants in a gender discrimination complaint filed with the U.S. Department of Labor, Office of Federal Contract Compliance Program ("OFCCP") which resulted in a three-year investigation and the issuance of a Notice of Results of Investigation ("NORI"). A NORI issued in the name of each complainant stated that the Department of Labor had found sufficient evidence to conclude that sexual harassment occurred and a hostile work environment existed at LWC. In light of the pendency of the district court actions, the Department of Labor declined to address the individual claims of the plaintiffs. The plaintiffs seek to supplement their documentation with the NORIs. They do not seek to introduce them for any preclusive effect. As such, they are admissible as investigative reports made by a government agency, in accordance with Fed.R.Evid. 803(8)(C). *See, Chandler v. Roudebush*, 425 U.S. 840, 863, n. 39, 96 S.Ct. 1949, 1960, 48 L.Ed.2d 416 (1976); *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 557-558 (6th Cir. 1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979). LWC objects to the consideration of the NORIs by Cecil, noting that it has raised concerns about the impartiality of the investigation, and the reliability of unsworn and self-serving testimony gathered during the investigation. This goes to the weight rather than the admissibility of the evidence. Thus Cecil will be permitted to file the NORIs in supplement to her memorandum.

summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Title VII of the Civil Rights Act of 1964 ("Title VII") makes it "an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986).

As a prerequisite to filing a Title VII action in this court, a plaintiff must first file a timely charge with the Equal Employment Opportunity Commission ("EEOC") and receive a Notice of the Right to Sue. Cecil filed a filing her complaint with the EEOC on January 9, 2003 and received a Right to Sue letter dated July 11, 2003. This action was filed on September 5, 2003, within the ninety-day limitation period. 29 C.F.R. § 1601.28(e)(1). All claimed violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, must be presented to the EEOC no later than "180 or 300 days after the occurrence of the unlawful practice to file a charge with the EEOC."

*National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002).  The Supreme Court further explained:

> The critical questions, then, are: What constitutes an "unlawful employment practice" and when has that practice "occurred?"  Our task is to answer these questions for both discrete discriminatory acts and hostile work environment claims...We take the easier question first.  A discrete retaliatory or discriminatory act "occurred" on the day that it "happened."  A party, therefore, must file a charge within either 180 or 300 days of the date of the act or lose the ability to recover for it...[D]iscrete acts that fall within the statutory time period do not make timely acts that fall outside the time period...[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges...Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice."...Hostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct...The "unlawful employment practice" therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. [citations omitted]...Such claims are based on the cumulative effect of individual acts...Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris*, 510 U.S., at 21, 114 S.Ct. 367 (citations omitted).  In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, at 23, 114 S.Ct. 367...As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has "occurred," even if it is still occurring.  Subsequent events may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole.

*National Railroad Passenger Corp.*, 122 S.Ct. at 2070 - 74.

In order to establish a claim of gender discrimination, a plaintiff may rely on direct evidence of discrimination, if such evidence is available.  Direct evidence is evidence that proves the existence of a fact without employing inference.  *See. Grizzell v. City of Columbus Division of*

*Police*, 461 F.3d 711, 719 (6th Cir. 2006), *citing, Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Cecil contends that she did not receive training and assistance, received improper assignments and had her work outsourced because of her gender. Cecil Response, p. 4 - 6. Gender discrimination cannot be gleaned from these purported actions without the employment of inferences of an anti-female bias which Cecil suggests should be drawn by viewing the work environment at LWC as a whole and considering much anecdotal evidence. This is not direct evidence of gender discrimination against Cecil. *See, Grizzell*, 461 F.3d at 719.

In the absence of direct evidence, Cecil may utilize the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this model, Cecil must establish a *prima facie* case of gender discrimination on her claims relating to her work assignments and goals. If she establishes a *prima facie* case, the burden of production shifts to LWC to articulate a legitimate, nondiscriminatory reason for its actions. If LWC satisfies its burden of production, Cecil must then prove by a preponderance of the evidence that LWC's nondiscriminatory reason for its actions was merely a pretext for intentional discrimination. The ultimate burden of persuasion rests with Cecil to establish pretext. *McDonnell Douglas Corp.*, *supra*; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Nguyen v. City of Cleveland*, 229 F.2d 559, 562 (6th Cir. 2000). Pretext may be shown by establishing that "the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [her] discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)(emphasis in original and citations omitted). The law requires that "an employer not discriminate against an employee on the basis of the employee's protected class characteristics."

*Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000). Cecil is then required to show that LWC's purported legitimate reason camouflages an unlawful employment action. However, "the soundness of an employer's business judgment may not be questioned as a means of showing pretext." *Chappell v. GTE Products Corp.*, 803 F.2d 261 (6th Cir. 1986). "The plaintiff[] may not simply substitute [her] own business judgment for that of the defendant." *Rowan*, 369 F.3d at 550.

A hostile work environment claim, under Title VII, is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *National Railroad Passenger Corp*, 536 U.S. at 116. To establish a *prima facie* case of gender-based harassment, Cecil must establish that (1) she was a member of the protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon gender; (4) the harassment was sufficiently severe or pervasive to create a hostile or abusive working environment; and (5) some basis exists for imputing liability to the employer. *See, Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir. 2000); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Meritor Savings Bank, supra*. The Supreme Court has repeatedly held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Non-sexual conduct may be illegally sex-based and properly considered in the hostile environment analysis where it can be shown that but for the employee's sex, she would not have been the object of harassment. In *Bowman*, 220 F.3d at 463-64, the Sixth Circuit explained

> Any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* [*v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)] standard, constitute a hostile environment in violation of Title VII. [quoting, *Williams v. General Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999)]. However, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discrimina[tion]...because of...sex.'" *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)(emphasis in original). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (citation omitted). We agree with the district court that while Bowman recites a litany of perceived slights and abuses, many of the alleged harassing acts cannot be considered in the hostile environment analysis because Bowman has not shown that the alleged harassment was based upon his status as a male...[I]t is important to distinguish between harassment and discriminatory harassment in order to "ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)...The only incidents that may arguably be considered in the hostile work environment analysis are the 1991 shoulder rubbing incident, the Christmas party incident, the 1994 whirlpool incident, the 1994 swimming pool incident, and the 1995 meeting in Jahnke's office...[W]e agree with the court's holding that the incidents that may properly be considered are not severe or pervasive and, thus, do not meet the fourth element of the hostile work environment analysis. While the allegations are serious, they do not constitute conduct that is pervasive or severe.

In determining whether the alleged harassment is sufficiently severe or pervasive, the court must consider the totality of the circumstances. "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Williams*, 187 F.3d at 562, *quoting, Oncale*, 118 S.Ct. at 1003. The Sixth Circuit stated in *Williams*, 187 F.3d at 563,

> [T]he totality-of-circumstances test must be construed to mean that even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation. This totality-of-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action. Hence, courts must be mindful of the need to review the work environment as a whole rather than focusing

> single-mindedly on individual acts of alleged hostility.  As one court has noted: The [severe or pervasive] analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode.  Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes."  *Robinson v. Jacksonville Shipyards, Inc.*, 760 F.Supp. 1486, 1524 (M.D.Fla. 1991).

The directive in *Williams,* then, is to evaluate whether the actions, properly viewed in context, "could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment, and they go to the core of [the] entitlement ot a workplace free of discriminatory animus."  *Williams*, 187 F.3d at 563.

To establish a *prima facie* case of retaliation*,* Cecil must show that she (1) engaged in an activity protected by Title VII, (2) LWC knew of her exercise of protected rights, (3) LWC thereafter took  an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse employment action.  *Virts v. Consolidated Freightways Corp. of Delaware*, 285 F.3d 508, (6th Cir. 2000)(*citing Williams, supra.,* and *Canitia v. Yellow Freight Systems, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990).  The *McDonnell Douglas* burden-shifting matrix applies to this claim as well.  An adverse employment action is a "materially adverse change in the terms and conditions of her employment." *Smith v. City of Salem, Ohio*, 378 F.3d 566 (6th Cir. 2004), *quoting, Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

By way of background, LWC states that it is a municipally-owned utility that provides water to more than 800,000 customers in the Louisville Metro area, parts of Oldham and Bullitt counties. John Huber is the President and CEO of LWC.  Edwin Chestnut is Assistant to the President and Director of Buisness Performance Measures.  Gregory Heitzman, Senior Vice President of Operations and Chief Engineer, reports directly to Huber.  Under the vice presidents are "business

system owners" which are similar to manager or director positions. Below business system owners are "process owners" which are equivalent to supervising or group leader positions.

Cecil was hired on October 29, 2001 as a Right of Way Associate with LWC. She was hired with the understanding that she would be responsible for drafting deeds of easement and purchase agreements. The position required that she be out in the field, meeting with property owners to obtain easements on which LWC could install water facilities. When hired, her process owner was Ron Eiler, her business system owner was Edwin Chestnut. Eiler was Cecil's direct supervisor for eleven months. Cindy Kowalski became her supervisor from September, 2003 until February, 2004. From February, 2004 until her termination, Cecil was supervised by Patty Kaelin.

Cecil was apparently unhappy with her employment from the first day, and kept copious notes and documentation concerning her dissatisfaction. She indicated that she felt slighted and ignored by her co-workers, both male and female, that she was not provided training required to perform the functions of her job, and was not treated similarly to a male Right of Way Associate, Wayne Kimbel. Kimbel testified, however, that he did not receive any initial training to aid him in completing the tasks of the right of way job. He testified that "pretty much you hit the streets and you learned – you know, as problems cropped up, of course, you had the experienced crew that would, you know, if they had time would help you as they can. But the workload was such that, you know, there just wasn't the ability to provide a lot of hand holding..." Cecil admitted in her deposition testimony that when she asked for direction, Eiler provided it or referred her to Debra Vaughn, and that she ultimately had the tools and information necessary to do her job.

Cecil complained that she was treated unpleasantly by Eiler when she requested help. She stated that a project engineer, Anthony Hewitt, was more congenial to Kimbel than he was to her.

She testified that when she asked on one occasion early in her employment that Hewitt accompany her, he stated that he was unable to go with her to the project site. She stated, however, that she was ultimately able to get the information needed for the project. She did not know if Hewitt accompanied Kimbel on any projects.

Cecil contends that Eiler assigned her an "unattainable goal" when he requested that she perform a cost analysis for the use of consultants for the negotiation of easements versus the use of in-house negotiators perform that function. She was unable to complete the analysis because the project managers had not compiled the information in the manner requested by Eiler. However, she admits that she was not penalized for her inability to complete the project. Cecil contends that she was discriminated against when this assignment was given to her because Kimbel had been given a capital project and her cost analysis project was not a capital project. She has provided no evidence of an entitlement to capital project assignments. Further, she does not know whether Kimbel was also assigned non-capital projects during his tenure as a Right of Way Associate.

Cecil contends that she suffered gender discrimination when a scheduled field trip to various construction sites was cancelled. She contends that she felt humiliated because Eiler did not tell her that the field trip was cancelled, but that she instead heard it through Vaughn. She does not dispute that it was cancelled because she was being considered for transfer to a different area. She was in fact given responsibility for transmission mains. The field trip that had been scheduled had nothing to do with transmission mains.

In April of 2002, Cecil asked Eiler if she could attend some training with survey crews for reviewing plats and plans with property owners. She contends that he stated "Who's going to pay for it? We don't have money in the budget for you to spend days not working on a capital project.

You just want to play in the dirt!" He also stated that she reminded him of Lisa Douglas on the Green Acres television show. Cecil claims that early in her employment, Eiler said that she "dressed too nice," and that she would "intimidate property owners." She testified that in March of 2002 Eiler embarrassed and humiliated her in a company meeting. She testified that after she had an unpleasant encounter on a job site with Hewitt where he used derogatory language and acted violently, she went to Eiler who told her that he would not say anything to Hewitt, and that the next time she should let Hewitt drive. Cecil contends that Eiler told her on various occasions that the field was no place for a lady, and that there were spiders and snakes out there.

In May of 2002, Cecil told John Anderson, the Employee Relations Manager, that she thought she was being discriminated against. She again voiced her concerns to diversity counsel in June of 2002. She was instructed to participate in conflict resolution meetings with Eiler. She contends that shortly after she reported Eiler in September, 2002 for allegedly writing derogatory comments about female employees on "Green Sheets,"(payroll sheets which were distributed on the floor) Eiler was reassigned. Cecil contends that after his reassignment, his harassment of her worsened. He was permitted to remain in the same location in close proximity to Cecil for over a month.

In October 2002, Eiler was replaced by Kowalski. She completed an evaluation of Cecil based upon scores provided by Eiler, even though Eiler was no longer her supervisor. Cecil admits that she had received two code of conduct infractions and thus received low scores and a 1% raise.

In January, 2003 when she still had not received the training she requested, she filed an EEOC complaint. In April of 2003, it was recommended by management that Cecil receive a

number of training opportunities. LWC did not follow up to see whether these opportunities came to fruition.

Cecil makes numerous allegations that she was discriminated against, and after reporting her opinions, suffered retaliation. None of the allegations have been shown to have anything to do with her gender, nor is there evidence that they were in any way retaliatory for her making of various gender discrimination claims.

She urges that project engineers were uncooperative, Kimbel was assigned a tank site that she had requested, transmission easements were being outsourced, she was not assigned the MWBE-model program which she had requested, her tank site duties were ultimately reassigned to a part-time contract employee, a plant tour was cancelled and her professional goals were set too high. She also claimed that she was improperly monitored and disciplined for repeated tardiness, she received a negative evaluation due to two code of conduct violations and therefore received only a 1% pay raise. These criticisms are the quintessential attempt at micro-management. Cecil's beliefs that her co-workers should be friendlier and cooperative, that she should receive the training assignments and advancement opportunities that she wanted, and that attendance and tardiness policies should not be enforced are all matters of business judgment and beyond the purview of the court to evaluate.

Cecil urges that Kimbel received better treatment than she did. From an interpersonal perspective, apparently that was true. There is evidence in the record that co-workers and supervisors, both male and female, found Cecil to be extremely trying. There is no evidence that the management decision concerning work assignments and training opportunities had anything to do with gender. In an effort to find a connection, she seeks to imply anti-female animus in the Lisa

Douglas comment suggesting that she was too well-dressed and well-to-do for rural areas. This and the few other admittedly inappropriate comments by Eiler are too thin a basis upon which to premise her argument that she was systematically excluded from employment opportunities by LWC. Here claim for gender discrimination is therefore without merit.

With respect to her allegations of retaliation, Cecil must establish that she was engaged in protected activity of which LWC was aware, LWC took an adverse retaliatory action against her or she was subjected to severe or pervasive retaliatory harassment by a supervisor, and the protected activity and adverse action were causally connected. *Randolph, supra.* We conclude that Cecil has not shown that she was subjected to severe or pervasive retaliatory harassment or that retaliatory action was taken against her for her filing of discrimination claims.

Assuming *arguendo* that a reasonable employee would find that discipline, denial of training, change in assignments and outsourcing of work met the *Burlington* "materially adverse" standard, Cecil has not shown that there was a causal connection between the actions and the protected activity.[2] The various business reasons articulated for assignment decisions and outsourcing of work - departmental reorganization and increase of productivity - undercut Cecil's contention that all of these actions were taken because of her complaints. Additionally, Cecil does not deny that she was insubordinate on occasion and chronically tardy. Her justification for insubordination was that she was being asked to do something illegal. Her defense to the tardiness was that she was usually only ten minutes late which was not "technically" late, according to the company handbook. However, she admits that she and other members of her work group were already being permitted to come in an hour later than the standard workday to accommodate their need for a more flexible schedule.

---

[2] We do not include the stalking and threatening allegations herein, as these claims are unproven against LWC.

Cecil's claim of a hostile work environment at LWC is the central theme of this lawsuit and the thread which she uses to stitch together this purported anti-female bias to "incidents" which she contends impacted her employment. *See, Faragher v. City of Boca Raton*, 524 U.S. at 788. Her argument is essentially that LWC was such an anti-female employer that everything that occurred, no matter at what level or by whom perpetrated, was an exercise in squelching the rights and opportunities of women. Cecil's brief is replete with broad-brush pronouncements to this effect, such as

> The claims arise in an atmosphere that is best described as suffering from a discrimination plague. The organization is so diseased that it cannot see its own contamination. Instead of seeking a cure, it has decided to remain committed to maintaining its "good-old-boy" atmosphere. Repeated efforts to fix the situation met with disdain. Those responsible for infecting the environment were allowed to run rampant in the organization, and were rewarded with promotions, transfers, or severance packages. On the other hand, the organization acted to systematically terminate every female complainant.

Cecil Response, p. i, Introduction. While the court is directed to take a "holistic perspective" (*Williams*, 187 F.3d at 563)and evaluate the "constellation of surrounding circumstances, expectations, and relationships" (*Williams*, 187 F.3d at 562, *quoting, Oncale*, 118 S.Ct. at 1003) in assessing whether a hostile environment exists, the court is still constrained to find *facts* supported by *record evidence* which establishes a hostile work environment. Cecil's argument is one of the tail wagging the dog. Rather than evaluating as we must the evidence to determine whether the cumulation of evidence establishes a hostile work environment, Cecil would have the court start from a general premise that gender bias exists and superimpose that premise on all aspects of LWC's operation.[3] We find that there is no genuine issue of material fact with respect to the claim of hosilte

---

[3]We note that our decision herein is not necessarily in conflict with the labor department finding of a hostile work environment and we express no opinion as to its correctness. We are faced here with the question of whether Cecil has shown that

(continued...)

- 13 -

work environment. The inappropriate and hostile behavior of Eiler and upper management's responses to it are the sum total of Cecil's sexual harassment claim when the generalizations and hyperbole are diregarded and the record evidence is evaluated. Eiler's inappropriate comments and erratic behavior have not been shown to have been so severe and pervasive that a reasonable person would find the environment hostile and abusive. *Compare, Morris v. Oldham County Fiscal Court*, 201 F.3d 784,790 (6th Cir. 2000)(holding that the employer's alleged request for sexual favors from the employee in exchange for a better evaluation, calling the employee "Hot Lips," making comments about the employee's state of dress, and telling dirty jokes in front of the employee did not create a hostile work environment); *Burnett v. Tyco Corp*, 203 F.3d 980 (6th Cir. 2000)(holding that the conduct of a supervisor who placed a pack of cigarettes under a female employee's bra strap, remarked that she had "lost her cherry," and said that he was aroused by the phrase "dick the malls" was not sufficiently severe to create a hostile work environment); *Black v. Zaring Homes, inc.*, 104 F.3d 822, 826 (6th Cir. 1997)(holding that a supervisor's teasing about the employee dancing on tables at a local strip bar, joking about "Hooterville" and "Titsville," calling her a "broad," and making fun of her pronunciation of "bosom" did not create an objectively hostile environment).

Eiler is alleged to have made a number of derogatory remarks about women and two or three in particular addressed to Cecil. She was told that Eiler made inappropriate comments on the payroll Green Sheets in 2002, but did not know whether these comments were directed at her. She made management aware of his conduct, in any event, and he was reassigned to another location in

---

[3](...continued)
LWC was so permeated with anti-female bias that the actions could be viewed by a jury as humiliating and fundamentally offensive to any woman in that work environment. Claims under Title VII are put to both a subjective and objective test. That is, the conduct must be so severe and pervasive as to constitute a hostile or abusive working environment both to a reasonable person and the actual victim. *Randolph*, 453 F.3d at 733.

September, 2002. Eiler remained on the floor at his same desk from mid-September until November. Cecil was moved to a desk in the center of the department, a location closer to her supervisor and a location past which Eiler walked. While permitting Eiler to remain on the floor was clearly not the wisest course of action, LWC did finally remove him from the proximity of Cecil. Cecil testified however that Eiler's presence, while uncomfortable, did not impair her ability to perform her job.

Cecil contends that Eiler made a number of harassing and threatening phone calls to her husband's cellular telephone and to her home. She also contends that LWC employees followed her on a number of occasions. She has offered no proof of these allegations. Rather she suggests that her contentions must be true simply because she filed claims against LWC. In fact, Cecil reported each of these incidents to LWC management and to the police. LWC investigated. The police investigated. No proof of threats or "stalking" were substantiated beyond Cecil's own allegations that she was being threatened by LWC for filing her claims. No criminal charges have resulted.

Cecil has come forward with evidence to support her allegations that she spoke out about Eiler's poor treatment of a number of female employees including herself, and that her complaints were either ignored or ineptly and ineffectively handled, until June of 2002 when she reported Eiler's conduct to diversity counsel. She claims she was instructed to participate in conflict resolution meetings with Eiler, but nothing else was done at that time.

Cecil contends that the hostile environment worsened in 2002 after Eiler's reassignment. Because Eiler was allowed to remain in the location, in close proximity to her and others in the Right of Way department, it was a situationally difficult and uncomfortable work environment. She contends that in a meeting with Heitzman concerning the animosity and hostility she was

experiencing after filing her EEOC and OFCCP complaints, Heitzman told her that this was the "ripple effect" and that "[she] should have expected this before [she] came forward." However, she does admit that after each incident was reported to LWC, it investigated the situation.

The hostile behavior in the workplace that she contends she experienced from Septemebr until Eiler's relocation in November, while clearly troubling to Cecil, cannot be said to be so severe and pervasive as to constitute a hostile work environment for Cecil. Cecil knew that Eiler would be relocated in a matter of weeks. She testified that she did not have any direct problems with him in the office during that period.

There has been evidence offered concerning LWC's handling of a number of other incidents of harassment of female employees by other male management personnel allegedly occurring in 2002 and 2003. These incidents have not been shown to have any bearing on Cecil or her harassment claim.

We note in conclusion that our decision concerning the hostile environment claim does not draw upon any of the findings in the NORIs and we express no opinion herein regarding their correctness. While the NORIs make for interesting reading, painting a broader picture of sexual harassment in the LWC workplace, they do not form the basis for our findings of fact and conclusions of law under Title VII. Indeed, as noted earlier, Cecil has not offered the NORIs for an preclusive effect in this court, but rather as supplemental documentation in support of her opposition to summary judgment. Our decision concerning the claim of hostile environment is premised primarily on the admittedly problematic conduct of Eiler and the question of the sufficiency of LWC's response and handling of the issues arising in that regard.

For the reasons set forth herein, summary judgment will be granted and the amended complaint will be dismissed. A separate order will be entered this date in accordance with this opinion.